# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 4, 2017     Decided September 29, 2017

No. 16-5073

ANIMAL LEGAL DEFENSE FUND, INC., ET AL.,
APPELLANTS

v.

SONNY PERDUE, SECRETARY, UNITED STATES DEPARTMENT
OF AGRICULTURE AND ROBERT GIBBENS, WESTERN REGIONAL
DIRECTOR, ANIMAL AND PLANT HEALTH INSPECTION SERVICE,
UNITED STATES DEPARTMENT OF AGRICULTURE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01462)

*Stefanie Wilson* argued the cause and filed the briefs for appellants. *Katherine A. Meyer* entered an appearance.

*Delcianna J. Winders* was on the brief for *amicus curiae* Delcianna J. Winders in support of plaintiffs-appellants.

*Anna E. Frostic* was on the brief for *amici curiae* The Humane Society of the United States and The Fund for Animals in support of plaintiffs-appellants.

*Jeremy S. Simon*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* GRIFFITH.

EDWARDS, *Senior Circuit Judge*: The Animal Welfare Act ("AWA" or "Act") charges the United States Department of Agriculture ("USDA") with administering a licensing scheme for animal exhibitors, including zoos. 7 U.S.C. § 2133 (2012). The Act directs the Secretary of Agriculture ("Secretary") to promulgate regulations governing minimum animal housing and care standards, *id.* § 2143, and also to issue licenses to entities and individuals seeking to engage in exhibition activities, *id.* § 2133. Although the Act leaves many regulatory details to the agency's discretion, it specifies that "no license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary." *Id.*

USDA has bifurcated its approach to licensing: For initial license applications, an applicant must agree to comply with the agency's prescribed standards and regulations, pay an application fee, keep its facilities available for agency inspection, and pass an agency compliance inspection of its facilities before the license may be issued. 9 C.F.R. §§ 2.1-2.12. For license renewals, an applicant must submit an annual report, pay the appropriate application fee, certify compliance

and agree to continue to comply with agency standards and regulations, *id.*, and agree to keep its facilities available for inspection by the agency "to ascertain the applicant's compliance with the standards and regulations," *id*. § 2.3(a). The agency treats the renewal procedure as administrative – that is, if the requirements are met, the agency will issue a license renewal. *Id.* § 2.2(b). Separately, USDA conducts random inspections of licensed facilities as part of its enforcement regime. *See id.* § 2.126. Violations discovered during these inspections may lead to license revocation or suspension, following notice and an opportunity for a hearing. *Id.* § 2.12; 7 U.S.C. § 2149.

Tom and Pamela Sellner own and operate the Cricket Hollow Zoo in Manchester, Iowa. USDA granted their initial license application in 1994, and it has renewed their license each year since. Appellants Tracey and Lisa Kuehl, along with the Animal Legal Defense Fund ("ALDF"), a non-profit animal rights organization, brought suit against the agency challenging its most recent renewal of the Sellners' license. Appellants alleged that, at the time of the renewal, the agency was aware that Cricket Hollow was in violation of numerous animal welfare requirements under the Act and its implementing regulations. Accordingly, they argued, the agency's decision to renew the Sellners' license was contrary to AWA's requirement that "no . . . license shall be issued until the . . . exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary." 7 U.S.C. § 2133. They also asserted that the agency's reliance on the Sellners' self-certification of compliance as part of its renewal determination, despite having knowledge that the certification was false, was arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

The District Court dismissed the case, concluding that USDA's license renewal regulations constituted a permissible interpretation of the Act. *ALDF v. Vilsack*, 169 F. Supp. 3d 6 (D.D.C. 2016). Finding that the challenged license renewal was issued in accordance with those regulations, the court held that none of the challenges in the complaint could succeed. *Id.* at 20. The Kuehls and ALDF appealed the District Court's decision to this court. We find that AWA's compliance demonstration requirement does not unambiguously preclude USDA's license renewal scheme and that the scheme is not facially unreasonable. Accordingly, for the reasons set forth below, we affirm the judgment of the District Court on the statutory claim. However, we vacate the District Court's order granting the Government's motion to dismiss Appellants' arbitrary and capricious claim, and remand the case to the District Court with instructions to remand the record to the agency for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Statutory and Regulatory Background

Congress enacted the Animal Welfare Act in 1966 to ensure the humane treatment of animals used in medical research. Pub. L. 89-544, 80 Stat. 350 (Aug. 24, 1966); *see also* 7 U.S.C. § 2131. In 1970, Congress amended the Act to cover animal "exhibitors," a category that includes zoos. Pub. L. 91-579, 84 Stat. 1560-61 (Dec. 24, 1970); *see also* 7 U.S.C. § 2132(h). The Act authorizes the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by . . . exhibitors," including minimum standards addressing the animals' "handling, housing, feeding, watering, sanitation, ventilation, shelter . . . , adequate veterinary care, . . . [and] for a physical

environment adequate to promote the psychological well-being of primates." 7 U.S.C. § 2143(a).

In order to ensure compliance with those standards, the Act prohibits an individual from exhibiting animals "unless and until" he or she has "obtained a license from the Secretary and such license shall not have been suspended or revoked." *Id.* § 2134. The Act delegates to the Secretary authority to prescribe the "form and manner" by which an exhibitor must apply for a license, "[p]rovided[] [t]hat no such license shall be issued until the . . . exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to section 2143 of [the AWA]." *Id.* § 2133 (emphasis omitted).

The Act also grants the agency enforcement authority. "If the Secretary has reason to believe that any person licensed as a[n] . . . exhibitor . . . has violated or is violating any provision of [the Act], or any of the rules or regulations or standards promulgated by the Secretary [t]hereunder, he may suspend such person's license temporarily . . . ." *Id.* § 2149(a). "[A]fter notice and opportunity for hearing," the Secretary "may suspend for such additional period as he may specify, or revoke such license, if such violation is determined to have occurred." *Id.* The Secretary may also impose civil and criminal penalties. *Id.* § 2149(b), (d).

Finally, the Secretary may "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the statute]." *Id.* § 2151.

The Secretary has delegated his responsibilities under the Act to the Administrator of the Animal and Plant Health Inspection Service ("APHIS"). *See* Animal Welfare; Inspection, Licensing, and Procurement of Animals, 69 Fed.

Reg. 42089, 42089 (July 14, 2004) (to be codified at 9 C.F.R. pts. 1, 2). Pursuant to that authority, APHIS has adopted a comprehensive scheme of animal welfare requirements applicable to licensees. *See* 9 C.F.R. §§ 3.1-3.142 (2017). These include general and species-specific requirements, such as providing potable water daily, *id.* § 3.55, keeping enclosures reasonably free of waste and regularly sanitized, *id.* § 3.1, removing feces and food waste daily, *id.* § 3.11, and addressing social needs of primates to "promote [their] psychological well-being," *id.* § 3.81.

The agency has also promulgated a series of regulations governing the granting, renewal, and revocation of animal exhibition licenses. Since 1989, the implementing regulations have distinguished between applications for an initial license and those for annual license renewal. In their present form, the regulations direct that an applicant for an initial license must (1) "acknowledge receipt of the regulations and standards and agree to comply with them by signing the application form," *id.* § 2.2(a); (2) submit the appropriate fee, *id.* § 2.6; and (3) "be inspected by APHIS and demonstrate compliance with the regulations and standards . . . before APHIS will issue a license," *id.* § 2.3(b). By contrast, an applicant for a license renewal must (1) pay the annual fee before expiration of the license, *id.* § 2.1(d)(1); (2) self-certify "by signing the application form that to the best of the applicant's knowledge and belief, he or she is in compliance with the regulations and standards and agrees to continue to comply with [the same]," *id.* § 2.2(b); and (3) submit an annual report detailing the number of animals owned, held, or exhibited at his or her facility, *id.* § 2.7. Both types of applicants "must make his or her animals, premises, facilities, vehicles, equipment, other premises, and records available for inspection during business hours and at other times mutually agreeable to the applicant and APHIS." *Id.* § 2.3(a). "A license will be issued to any

applicant" that has met the relevant regulatory requirements and has paid the application and license fees. *Id.* § 2.1(c).

## B. Factual and Procedural Background

Tom and Pamela Sellner first applied for an animal exhibition license over twenty years ago. At the time, the couple operated a small "mobile zoo" that included only a few animals. *See Kuehl v. Sellner*, 161 F. Supp. 3d 678, 690 (N.D. Iowa 2016). USDA granted the application and issued a license for Cricket Hollow Zoo on May 27, 1994. Appellees' Br. 16. The Sellners have since complied with the administrative license renewal requirements at every anniversary of the license's issuance. USDA has, in turn, granted their renewal applications each year. *Id.* The Sellners' 2015 license renewal application indicates that the Zoo now houses approximately 193 animals. 2015 License Renewal Application, *reprinted in* Appendix ("App.") 384.

Sisters Tracey and Lisa Kuehl are Iowa residents. Supplemental Complaint ("Supp. Compl.") ¶¶ 13-14, 24, *reprinted in* App. 46, 50. They allege that they visited Cricket Hollow Zoo on several occasions between 2012 and 2013. *Id.* ¶¶ 13-30, App. 46-51. Both sisters claim that they experienced distress and anguish as a result of witnessing animals in what they felt were inhumane and harmful conditions. *Id.* Tracey Kuehl asserts that she observed animals in enclosures that had "standing water and accumulating excrement," and that "a lion was repeatedly ramming itself against the cage wall," which she interpreted as a sign of obvious psychological distress. *Id.* ¶ 15, App. 47. She later learned that three Meishan piglets had died in their enclosure and that their bodies had not been removed before the facility was opened to the public. *Id.* ¶¶ 18-19, App. 48. Lisa Kuehl similarly alleges that she witnessed animals in isolated confinement and in cages that lacked

drinking water. *Id.* ¶¶ 25-28, App. 50-51. She asserts that she observed "lions and wolves covered with flies . . . [which] filled up the interior of the animals' ears," as well as a baby baboon who was "separated from the other animals and being continuously handled by humans." *Id.* ¶¶ 25, 27, App. 50.

The Kuehls met with several state public officials and organizations to share their concerns about the Zoo. *Id.* ¶¶ 19-20, 26, App. 48-50. Tracey Kuehl repeatedly wrote to USDA about the conditions of the animals' enclosures. *Id.* In 2014, she wrote a letter asking that the agency "carefully review the consistent poor record of compliance [with AWA standards] and not renew [the Zoo's] license to exhibit the animals to the public." *Id.* ¶ 20, App. 49.

The Kuehls also assert that USDA officials had knowledge, apart from their letters, of Cricket Hollow's failure to comply with certain AWA regulations and standards. Appellants' Br. 3-5; *see also* Appellees' Br. 16-17. Appellants allege that agency inspectors have repeatedly reported that the animals lacked adequate veterinary care, and that "[t]here are not enough employees to clean [the Zoo] to meet appropriate husbandry standards . . . [or] provide for the health and well-being of the animals." Supp. Compl. ¶¶ 99-129, App. 63-68. They assert that USDA has sent official warnings to the Sellners for these "numerous non-compliances," *id.* ¶ 117, App. 66, and the USDA regional director has concluded that "it is clear that there is a chronic management problem" at the Zoo, *id.* ¶ 108, App. 64. Nonetheless, the agency granted the Sellners' license renewal application in May of 2014. *Id.* ¶ 81, App. 59.

Upon learning of the agency's 2014 renewal decision, the Kuehls and ALDF filed this action against the Secretary in the District Court on August 25, 2014. The original complaint

alleged that USDA's decision to renew the Zoo's license in 2014 violated the Act because the Sellners had not "demonstrated that [their] facilities comply" with the requisite animal welfare provisions of the Act or its regulations, which Appellants claim AWA § 2133 requires before a renewal may be issued. Complaint ¶¶ 123-28, *ALDF*, 169 F. Supp. 3d 6 (D.D.C. 2016) (Dkt. No. 1). In the alternative, the complaint asserted that the agency's reliance on the Sellners' self-certification of compliance in connection with the renewal decision was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Id.*

In 2015, USDA again renewed the Zoo's license, and Appellants filed a supplemental complaint on July 17, 2015, challenging the 2015 renewal and the Zoo's "pattern and practice" of renewing Cricket Hollow Zoo's license despite knowing that the Zoo is not in compliance with AWA regulations and standards. Supp. Compl. ¶¶ 131-36, App. 68-69.

On July 28, 2015, USDA moved to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Appellants opposed that motion.

When USDA produced its administrative record to the District Court, it included only the Sellners' renewal application, annual report, and evidence of payment of the renewal fee. While the Government's motion to dismiss was pending, Appellants moved for the court to compel inclusion of additional administrative documents related to the Cricket Hollow Zoo which they alleged were in the agency's records, including inspection reports indicating that the Zoo was out of compliance with AWA standards. The agency opposed the motion, claiming that it did not rely on those records in making

its renewal decision and that they were properly excluded from the record on review. On June 23, 2015, the District Court denied Appellants' motion. *ALDF v. Vilsack*, 110 F. Supp. 3d 157, 161-62 (D.D.C. 2015).

On March 24, 2016, the District Court granted USDA's motion to dismiss the complaint. *ALDF*, 169 F. Supp. 3d at 20. The court first concluded that the AWA is ambiguous as to whether "issu[ance of] a license" encompassed renewals. *Id.* at 13-15. It then accepted the interpretation put forth by Government counsel that § 2133 applies only to initial license applications. *Id.* at 16-19. Determining that the agency had "exercised its expertise to craft a reasonable license renewal scheme," *id.* at 19 (quoting *ALDF v. USDA*, 789 F.3d 1206, 1225 (11th Cir. 2015)), the court concluded that "under the *Chevron* doctrine, the Court need not say any more in order to conclude that the 2015 renewal of the Cricket Hollow Zoo's license was not unlawful" under the AWA. *Id.*

The District Court also rejected Appellants' arbitrary and capricious claim. It held that there was "no basis . . . to conclude that the licensing decision was arbitrary and capricious or an abuse of discretion" because it was undisputed that the Sellners satisfied the administrative criteria for license renewal, and the regulatory framework afforded no discretion to the agency in implementing the renewal process. *Id.* Finally, the court held that Appellants' "pattern and practice" claim necessarily failed as a result of its determination that the regulatory scheme was consistent with both the AWA and APA. *Id.* This appeal followed.

As of July 30, 2015, USDA had filed an administrative complaint against the Zoo and commenced a formal investigation into its substantive violations of the Act.

Appellees' Br. 17. That investigation is pending before the agency. *Id.*

## II. ANALYSIS

### A. Standard of Review

We review *de novo* the District Court's dismissal for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). *See Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001). In doing so, "we must treat the complaint's factual allegations as true, must grant plaintiff the benefit of all reasonable inferences from the facts alleged, and may uphold the dismissal only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotation marks omitted).

The APA requires that we "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review USDA's interpretation of the AWA under the familiar standard established in *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See ALDF v. Glickman*, 204 F.3d 229, 233 (D.C. Cir. 2000). Under the *Chevron* framework,

> an agency's power to regulate "is limited to the scope of the authority Congress has delegated to it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005). Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the

reviewing court proceeds to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44. Where a "legislative delegation to an agency on a particular question is implicit rather than explicit," the reviewing court must uphold any "reasonable interpretation made by the administrator of [that] agency." *Id.* at 844. But deference to an agency's interpretation of its enabling statute "is due only when the agency acts pursuant to delegated authority." *Am. Library Ass'n*, 406 F.3d at 699.

EDWARDS, ELLIOT, & LEVY, FEDERAL STANDARDS OF REVIEW 166-67 (2d ed. 2013).

We also review the agency's exercise of its delegated authority under the traditional "arbitrary and capricious" standard. Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The court's task in evaluating agency action under this standard is to ensure that "the process by which [the agency] reache[d] [its] result [was] logical and rational." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). In doing so, however, the court must "not . . . substitute its [own]

judgment for that of the agency." *State Farm*, 463 U.S. at 43. The court will ordinarily uphold an agency's decision so long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

Finally, we review the "[D]istrict [C]ourt's refusal to supplement the administrative record for abuse of discretion." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). "When reviewing agency action under the APA, we review 'the whole record or those parts of it cited by a party.'" *Id.* (quoting 5 U.S.C. § 706). The administrative record typically consists of "the order involved; any findings or reports on which it is based; and the pleadings, evidence, and other parts of the proceedings before the agency." FED. R. APP. P. 16(a). We allow parties to supplement the record only when they are able to "demonstrate unusual circumstances justifying a departure from this general rule." *Am. Wildlands*, 530 F.3d at 1002 (internal quotation marks omitted). "We have recognized such circumstances in at least three instances: (1) '[T]he agency deliberately or negligently excluded documents that may have been adverse to its decision'; (2) 'the [D]istrict [C]ourt needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors'; or (3) 'the agency failed to explain administrative action so as to frustrate judicial review.'" *Id.* (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).

**B. The Statutory Claim**

*1. USDA's Interpretation of the Statute*

The central question presented in this appeal is whether APHIS' renewal of the Sellners' license was contrary to § 2133 of the Act. That provision states, in relevant part, that:

> The Secretary shall issue licenses to dealers and exhibitors upon application therefor in such form and manner as he may prescribe and upon payment of such fee established pursuant to 2153 of this title: *Provided*, That no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to section 2143 of this title.

7 U.S.C. § 2133. Appellants argue that, because the renewal of a license involves issuance of a license, an exhibitor must have "demonstrated that his facilities comply" with AWA standards in order to be eligible for a license renewal. Because USDA's regulations do not require an on-site "inspection" (and the agency did not conduct one) to determine that Cricket Hollow Zoo had returned to compliance before renewing its license in 2015, Appellants claim that the renewal violated the statute. The parties consequently spent much time in their briefs and at oral argument debating whether a license is "issued" when it is renewed.

On this point, Appellants argue that "issue" unambiguously encompasses license renewal. Appellants' Br. 32. In their view, a renewal is merely a "form and manner" of application for a license. *Id.* at 33. It thus falls under § 2133 and is subject to the same restrictions that apply to initial license grants under that

provision. *Id.* at 32. In particular, Appellants argue that § 2133 mandates that the agency withhold a license's renewal until the applicant affirmatively demonstrates compliance with the regulations and standards. *Id.* at 26-27. The fact that the agency was aware at the time it granted the 2015 renewal that the Sellners were not in compliance, Appellants claim, indicates that the decision to grant the renewal necessarily violated the Act. *Id.* They further contend that the agency's automatic renewal scheme violates both the statutory text and the intent behind the AWA. *Id.* at 27.

In addition, Appellants contend that the agency should not prevail even if the court considers "issue" to be ambiguous. *Id.* at 39. They note that the Secretary has never issued a regulation through notice-and-comment rulemaking stating that renewal of a license does not involve the issuance of a license and so is not governed by § 2133. *Id.* at 40. Rather, they argue that this position was first articulated in a declaration the Government submitted in the course of unrelated litigation in 2013. *Id.* (citing Dr. Elizabeth Goldentyer Declaration (March 24, 2013), *Ray v. Vilsack*, No. 5:12-CV-212-BO, 2014 WL 3721357 (E.D.N.C. July 24, 2014)), *reprinted in* App. 258. Appellants point to earlier iterations of USDA's regulations that they claim "explicitly disavowed" the position that license renewal applicants need not demonstrate compliance with the regulations and standards. *Id.* at 41-42 (quoting Notice of Proposed Rulemaking, Animal Welfare Regulations, 54 Fed. Reg. 10835, 10840 (March 15, 1989); Animal Welfare; Licensing and Records, 60 Fed. Reg. 13893, 13894 (March 15, 1995)). Therefore, according to Appellants, this interpretation of the statute is merely a "post hoc litigation position" that is not entitled to *Chevron* deference. *Id.* at 39, 44-45 (quoting *Gerber v. Norton*, 294 F.3d 173, 184 (D.C. Cir. 2002)).

In response, USDA argues that the statute "is silent as to the need for license renewal and any requirements for renewal." Appellees' Br. 24 (capitalization and emphasis omitted). As a result, the agency asserts, the court should defer to its reasonable interpretation that no "demonstration" requirement is applicable to renewal applications. *Id.* at 22. The Government relies on the Eleventh Circuit's analysis of the definition of "issue" in a similar case, arguing that its plain meaning "does not necessarily include 'renew.'" *Id.* at 26 (quoting *ALDF*, 789 F.3d at 1216). It urges the court to adopt the Eleventh Circuit's position that "[n]o license is given out during the renewal process" and that "Congress has [not] spoken to the precise question" of whether § 2133 governs renewals. *Id.*; *see also People for the Ethical Treatment of Animals v. USDA*, 861 F.3d 502, 509 (4th Cir. 2017).

Yet, neither in its briefs nor at oral argument was agency counsel able to identify anything in the agency's regulations to support this position. Indeed, at oral argument, counsel appeared to concede that the Government developed its interpretation of "issue" in response to Appellants' briefing, rather than through rulemaking or any other agency proceeding. *See* Tr. of Oral Argument at 35-36.

The "issue" debate thus confuses the question before the court. The AWA implementing regulations make it clear that the agency interprets the statute not to require an existing licensee to satisfy the same requirements that an applicant for an initial license must satisfy in order to have its license renewed. *See* 9 C.F.R. §§ 2.1-2.3. Nothing in the agency's regulations suggests that USDA interprets § 2133 as not applying to renewals, or even that it believes renewal applicants need not demonstrate compliance with the regulations and standards in order to qualify for a renewal license. Rather, USDA's position since at least 1989 has been

that it has broad authority, conferred under the AWA, to fill any gaps in the statute by implementing an administrative renewal scheme that imposes different requirements on existing licensees than apply to initial license applicants.

In support of this view, the agency's regulations state:

> *Application for license renewal.* APHIS will renew a license after the applicant certifies by signing the application form that, to the best of the applicant's knowledge and belief, he or she is in compliance with the regulations and standards and agrees to continue to comply with the regulations and standards. APHIS will supply a copy of the applicable regulations and standards to the applicant upon request.

9 C.F.R. § 2.2(b).

> Each applicant must demonstrate that his or her premises and any animals, facilities, vehicles, equipment, or other premises used or intended for use in the business comply with the regulations and standards set forth in parts 2 and 3 of this subchapter. Each applicant for an initial license or license renewal must make his or her animals, premises, facilities, vehicles, equipment, other premises, and records available for inspection during business hours and at other times mutually agreeable to the applicant and APHIS, to ascertain the applicant's compliance with the standards and regulations.

*Id.* § 2.3(a).

> Each applicant for an initial license must be inspected by APHIS and demonstrate compliance with the regulations and standards, as required in paragraph (a) of this section, before APHIS will issue a license. . . .

*Id.* § 2.3(b). *See* Appellees' Br. 11-12, 37-39. It is clear from the foregoing provisions that the agency treats applicants for initial licenses and applicants for license renewals differently. It is also noteworthy that neither these regulatory provisions nor any others to which the parties point purport to define "issue" in § 2133 of the Act.

The Government's attention to the "issue" debate is thus merely a tangent. Rather, the heart of the Government's argument is that "the statute is silent as to whether an existing licensee must satisfy the same requirements, or any requirements at all, to have its license renewed." Appellees' Br. 3. The Government is explicit in contending that "the USDA's administrative regulatory renewal scheme is based upon a permissible construction of the AWA." *Id.* at 31 (capitalization and emphasis omitted). This entire argument rests on the cited agency regulations, which themselves focus on what an applicant must "demonstrate" in order to qualify for either an initial license or a renewal. *Id.* at 31-38. A careful review of the regulatory history of the licensing scheme makes this clear.

In 1987, USDA published in the Federal Register a proposal to amend its licensing regulations. Notice of Proposed Rulemaking, Animal Welfare Regulations, 52 Fed. Reg. 10,298 (Mar. 31, 1987). In 1989, the agency issued a second notice of proposed rulemaking, in which it proposed a revision that would "require that each applicant for a license *or renewal of a license must demonstrate compliance* with the regulations

and standards." 54 Fed. Reg. 10,840 (emphasis added). The notice also clarified "that licenses are valid and effective if renewed each year and have not been terminated, suspended, or revoked" in order to "avoid any misconception that every license automatically terminates at the end of its 1-year term and that each year an applicant must follow the procedure applicable to obtaining an initial license." *Id.* at 10,841. Pursuant to this regulatory initiative, the agency proposed several revisions to clarify that different requirements for demonstrating compliance apply to license renewals and initial license applications. *See, e.g.*, *id.* at 10,838 ("We have made conforming changes throughout Subpart A to differentiate between new license applications and license renewals."); *id.* at 10,842 (revising proposed annual reporting requirement to apply only to license renewal applications).

The Final Rule promulgated in 1989 was consistent with the proposal. *See* Animal Welfare, 54 Fed. Reg. 36,123, 36,149 (Aug. 31, 1989). The subsection of the regulation entitled "Demonstration of compliance with standards and regulations" addressed and distinguished between the requirements for both initial license and renewal applicants. *Id.* Section 2.3 stated that "[e]ach applicant" – whether for an initial license or a license renewal – "must demonstrate that his or her premises and any animals, facilities, vehicles, equipment, or other premises used or intended for use in the business comply" with the Act and regulations. *Id.* The hurdles each type of applicant was required to overcome in order to make this statutorily required showing were not identical, however. Both types of applicants were required to "make his or her animals, premises, facilities, vehicles, equipment, other premises, and records available for inspection," but only applicants for an initial license had to demonstrate compliance *through an actual inspection* before a license could be granted. *Id.*

In 1995, USDA promulgated a Final Rule amending the regulations to impose an additional self-certification requirement on applicants for license renewal. *See* 60 Fed. Reg. 13,893. The stated purpose of this amendment was to "help ensure that applicants for license renewal are in compliance with the regulations . . . , thus promoting compliance with the Animal Welfare Act." *Id.*

Finally, in 2004, the agency expressly rejected commenter suggestions to "add[] criteria for renewal of licenses" such that "no license should be renewed unless the facility was inspected and found compliant just prior to the renewal date." 69 Fed. Reg. 42,094. The agency determined that "[i]t is unrealistic and counterproductive to make license renewal contingent on not having any citations." *Id.* The Final Rule also clarified that so long as a license renewal applicant met the requirements set forth in sections 2.2, 2.3, and 2.7, the agency would reissue the license. *Id.* In other words, if the applicant submitted an annual report, paid the appropriate application fee, certified compliance and agreed to continue to comply with agency standards and regulations, and agreed to keep the facility available for inspection by the agency, the applicant would be deemed to have complied with the requirements for issuing a renewal license – including the compliance demonstration requirement.

There is no language in any proposed or final rule, or in the regulations themselves, to suggest either that license renewal applicants are not required to make *any* demonstration of compliance, or that license renewal applicants must demonstrate compliance above and beyond the stated requirements of self-certification and availability for inspection as a condition precedent to renewing a license.

The regulations say nothing about the meaning of the term "issue" under 7 U.S.C. § 2133 and do not suggest that USDA has ever interpreted that section not to encompass license renewal. We accordingly need not consider that interpretation. Courts do not apply *Chevron* deference "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988); *see also City of Kansas City v. Dep't of Housing & Urban Dev.*, 923 F.2d 188, 192 (D.C. Cir. 1991) ("That counsel advances a particular statutory interpretation during the course of trial does not confer upon that interpretation any special legitimacy. Deference under *Chevron . . .* can be accorded only to a judgment of the agency itself."); *Church of Scientology of Cal. v. I.R.S.*, 792 F.2d 153, 165 (D.C. Cir. 1986) (en banc) (Silberman, J., concurring) ("Courts have rejected as inadequate agency counsel's articulation of a statutory interpretation when that interpretation has been inconsistent with a prior administrative construction[,] when the record evidence before the court demonstrates no link between counsel's interpretation and administrative practice[,] or when agency counsel's interpretation is revealed as no more than a current litigating position." (internal citations and quotation marks omitted)).

We will instead focus our analysis on the agency's consistent interpretation, clearly evidenced by the regulatory history, that the AWA leaves to the Secretary's discretion how to handle license renewals, and that as part of that discretion, the Secretary may determine the appropriate means of demonstrating compliance with the regulations and standards applicable to licensed entities. This is consistent with USDA's core contention on appeal that its administrative renewal scheme is a permissible interpretation of the Act, necessary to fill the gaps left open by Congress' decision not to address renewal specifically. *See* Appellees' Br. 31. The Government

confirmed at oral argument that its renewal scheme embodies a permissible interpretation of § 2133's "demonstrate" requirement. *See* Tr. of Oral Argument at 36. And the Government has previously defended its renewal scheme on exactly this basis, explicitly arguing that "demonstrate" is ambiguous and that its interpretation survives scrutiny under *Chevron*. *See* USDA Reply Br. at 4, *Ray v. Vilsack*, 5:12-CV-212-BO (E.D.N.C. Jan. 22, 2013) (No. 24) ("[S]tep one of *Chevron* weighs in favor of the agency's authority to construe this statute and determine the means of demonstrating compliance with the AWA. The renewal approval process . . . satisfies step two of *Chevron*."). It is this interpretation – which is consistent with the agency's established regulations and administrative practice – that the court must evaluate to determine whether the renewal scheme is permissible under the statute. After all, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## *2.* Chevron *Analysis*

Appellants contend that USDA's renewal of Cricket Hollow Zoo's license "even when the agency kn[ew] the facility [was] operating in violation of the AWA and regulatory standards, violates the plain language of" the statutory requirement that no license may be issued until the exhibitor "shall have demonstrated that his facilities comply with the standards promulgated by the Secretary." Appellants' Br. 26-27 (quoting 7 U.S.C. § 2133). Appellants appear to concede that the agency granted the renewal only after the Sellners complied with the renewal requirements set forth in the agency regulations. Because the decision to renew the Cricket Hollow Zoo license was consistent with the regulations, Appellants' challenge to this specific renewal, and to the agency's alleged

"pattern and practice of rubber-stamping license renewal applications," is a challenge to the legality of the regulations themselves. We thus must determine whether the agency's administrative renewal scheme is "unambiguously foreclosed" by the statute. *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011) (quotation mark omitted).

We begin, of course, with the statutory text. *Maslenjak v. United States*, 137 S. Ct. 1918, 1924 (2017). The word "renewal" never appears in the AWA. Instead, the statute provides that "[t]he Secretary shall issue licenses to dealers and exhibitors upon application therefor in such form and manner as he may prescribe . . . ." 7 U.S.C. § 2133. The statute limits this explicit grant of discretion: issuance of a license must be conditioned "upon payment of such fee" as the Secretary shall establish, and on the exhibitor's "hav[ing] demonstrated that his facilities comply with the standards promulgated by the Secretary." *Id.* As the Government has emphasized, the statute does not set forth any length of time that a license should remain valid. Its only discussion of a license ending pertains to the possibility of revocation or suspension. *See id.* § 2149. The statute thus neither provides expressly for a renewal process, nor expressly sets forth standards that must govern the renewal process specifically.

Appellants contend, however, that a renewal plainly constitutes "issuance of a license" under § 2133 and that the process for granting renewals therefore must comply with the standards set out above. They assert that USDA's administrative renewal scheme is unlawful because, by permitting renewal even when the agency has reason to know the facility is operating in violation of the AWA and regulatory standards, it flouts the compliance demonstration requirement. The Act does not define "demonstrate," and Appellants have not pointed us to any statutory provision that would appear to

give additional content to the term. Appellants nonetheless assert that a demonstration of compliance cannot possibly be accomplished when the entity to whom the demonstration must be made is already aware of non-compliance, whether due to prior inspections or public reports. *See* Appellants' Br. 26-27.

Had Congress required that before issuing a license, the agency must find that the applicant is actually in compliance, Appellants' interpretation would be on strong footing. But Congress required merely a demonstration. And "demonstrate" may mean "to show," not "to be." *See* BLACK'S LAW DICTIONARY 432 (6th ed. 1990) ("[t]o show . . . by operation, reasoning, or evidence"). This definition comports with the ordinary usage of the term. It is common for a teacher to say that a student has demonstrated proficiency on an English exam, regardless of whether the student has actually mastered the rules of grammar. Similarly, one might be designated as having demonstrated compliance with applicable guidelines because he or she has met some minimum standard that an evaluating entity has set.

This latter meaning is consistent with the common legal use of "demonstrate." Statutes and regulations frequently require an entity to demonstrate something by meeting certain criteria or going through a process that either Congress or an agency has deemed indicative. *See*, *e.g.*, Clean Air Act, 42 U.S.C. § 7511d(e) (2012) (exempting from sanctions those ozone nonattainment areas that "can demonstrate, consistent with guidance issued by the Administrator, that attainment in the area is prevented because of ozone . . . transported from other areas"); EPA National Emission Standards for Hazardous Air Pollutant Emissions for Polyvinyl Chloride & Copolymers Production, 40 C.F.R. § 63.11896(c) (2012) (directing that sources wishing to make process changes "must demonstrate continuous compliance" with emissions and work practice

standards "according to the procedures and frequency" set out in separate regulations).

So too with § 2133. It is difficult to imagine how the agency could administer the provision's compliance demonstration requirement without establishing some procedure that license applicants must follow to make an appropriate showing. By declining to set forth the requirements of that demonstration procedure, Congress effectively delegated this authority to USDA. This is precisely the type of statutory gap-filling that "involves difficult policy choices that agencies are better equipped to make than courts," and to which federal courts must defer, so long as the agency's construction is reasonable. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (citing *Chevron*, 467 U.S. at 865-66).

Having concluded that Congress has implicitly delegated the authority to establish the procedure for demonstrating compliance to USDA, we must next ask, at *Chevron* Step Two, whether the process the agency developed to fill the statutory gap is consistent with the statute. That is, we may uphold the renewal scheme only if the agency reasonably determined that the renewal procedures fulfill the statutory demonstration requirement. *See id.*

USDA asserts that its renewal scheme balances the AWA's "dual, but sometimes competing, goals of protecting both the animals and the businesses that exhibit them." Appellees' Br. 33. The agency has explained that it would be too burdensome to require more from applicants in the context of license renewals than the regulations currently demand. *See* 69 Fed. Reg. 42,094. Specifically, USDA contends it would be "unrealistic" to make renewal contingent on licensees having no citations whatsoever. *Id.*

In other words, the agency has concluded that self-certification and availability for inspection are sufficient to demonstrate compliance in a license renewal. The agency has never said that self-certification alone is positive proof of compliance. Rather, the agency's regulations and the regulatory history make clear that self-certification and availability for inspection are enough, in the context of renewal, to satisfy the demonstration requirement because a renewal involves an applicant who has already survived a compliance inspection when the agency initially granted its license. To put it simply, the agency has concluded that (1) the initial inspection that was necessary to secure the initial license, plus (2) the self-certification of continued compliance, plus (3) availability for inspection at and beyond the time of renewal are enough to satisfy the statute. Considered in the context of the enforcement authority provided for elsewhere in the statute, and the attendant procedural protections afforded to license-holders in revocation and suspension proceedings under § 2149, we find that the agency's administrative renewal scheme embodies a reasonable interpretation of the statutory demonstration requirement.

In light of our determination that the agency's renewal scheme is consistent with the demonstration requirement in § 2133, we need not reach the "issue" issue. Regardless of whether "issue" encompasses renewal, the agency's scheme complies with the statute. As the Government has argued before us and before the District Court, the Secretary has consistently said that what an applicant must demonstrate when seeking the issuance of an initial license is different from what an applicant must demonstrate in order to qualify for the issuance of a renewal; and for a renewal, all that is required is that the applicant self-certify and make his or her premises available for inspection. The Government asserts that this scheme is consistent with the Act, and we agree. Because the

agency's decision to renew the Cricket Hollow Zoo license was made in compliance with that regulatory scheme, it was not inconsistent with the Act.

### C. The Arbitrary and Capricious Claim

Appellants also contend that, even if USDA's regulatory renewal scheme is generally consistent with the statute, the District Court erred in rejecting their claim that the agency's reliance on the Sellners' self-certification of compliance was arbitrary and capricious in violation of the APA. *See* Appellants' Br. 48.

To support this claim, they assert, *inter alia*, that "[f]rom December 16, 2013 to August 15, 2016, APHIS documented 77 violations at [Cricket Hollow Zoo] over the course of 14 inspections." Appellants' Br. 22 (citing APHIS, Inspection Reports, *available at* https://acis.aphis.edc.usda.gov /ords/f?p=116:203:0::NO (search Certificate Number 42-C-0084)). They allege that one such inspection occurred on the same day in 2015 that APHIS renewed Cricket Hollow Zoo's license, and resulted in eleven violations, including one "direct" violation and numerous repeat violations. *Id.* (citing APHIS Inspection Report 147151639230365 (May 27, 2015), *reprinted in* App. 387-92). Appellants also detail their own first-hand accounts in the record in order to highlight the deplorable conditions in which Cricket Hollow Zoo's animals must live and the "chronic noncompliance recognized by APHIS's own officials." *Id.* at 22-23 (citing Compl. ¶ 112, *reprinted in* App. 65).

Appellants also allege that Tracey Kuehl sent a letter to USDA on April 28, 2014, expressing concerns about the Zoo's noncompliance and requesting that the agency not renew the Zoo's license. The Administrator of APHIS, Kevin Shea,

responded on May 23, 2014, indicating that the agency would continue to renew the Zoo's license, although APHIS had recently opened an official investigation into the Zoo's mistreatment of animals. *Id.* at 24.

In Appellants view, these allegations demonstrate that the agency had reason to *know* at the time it renewed the Cricket Hollow Zoo license that the Sellners were out of compliance with the regulations and standards. They argue that the agency's action in renewing the license was therefore arbitrary and capricious because the agency had information showing that the Sellners' practices violated the regulations. In other words, Appellants assert that we are facing a "smoking gun" case in which the agency actually knows with certainty that the exhibitor's self-certification that it is "in compliance with all regulations and standards in 9 CFR, Subpart A, Parts 1, 2, and 3," APHIS Application for License Form 7003, *reprinted in* App. 384, is false. They claim it is arbitrary and capricious to nonetheless rely on the form as a demonstration of compliance in these circumstances.

USDA first responds that Appellants' arbitrary and capricious claim must fail because the reliance on the self-certification was consistent with the regulations, and the regulations are consistent with the statute. *See* Appellees' Br. 42-43. The District Court relied on a similar line of analysis when it dismissed Appellants' claim. *ALDF*, 169 F. Supp. 3d at 19 (concluding that the licensing decision cannot be arbitrary and capricious because the regulatory framework was consistent with the Act and affords the agency no discretion to refuse to rely on a self-certification form). The agency next argues that its reliance on the self-certification process, regardless of whether it knows that the licensee is failing to comply with AWA standards, is reasonable because the agency retains discretionary enforcement authority to suspend or

revoke the licensee's license under § 2149. Appellees' Br. at 43.

As an initial matter, both USDA and the District Court are incorrect that the arbitrary and capricious claim must fail solely because the agency prevailed on the AWA claim. Agency action may be consistent with the agency's authorizing statute and yet arbitrary and capricious under the APA. *See, e.g.*, *Humane Soc'y of the U.S. v. Zinke*, No. 15-5041, 2017 WL 3254932, at *10 (D.C. Cir. Aug. 1, 2017). The court's inquiry on the latter point depends not solely on the agency's legal authority, but instead on the agency's ability to demonstrate that it engaged in reasoned decisionmaking. *See State Farm*, 463 U.S. at 52. The mere fact that a regulatory scheme is generally consistent with the agency's authorizing statute does not shield each agency action taken under the scheme from arbitrary and capricious review.

The agency's second argument, at least as currently articulated, is insufficient as well. USDA explained its decision to renew the Sellners' license as being based on the Sellners' compliance with the regulatory renewal requirements: filing an annual report, the application fee, availability for inspection, and the self-certification of compliance. But, as explained above, an agency's decision is arbitrary and capricious when its "explanation for its decision . . . runs counter to the evidence before the agency." *Id*. at 43. According to Appellants' allegations, USDA knew that the Sellners were grossly and consistently out of compliance with AWA standards. In basing its explanation for the renewal decision in part on the basis of the Sellners' self-certification, the agency's explanation for its decision runs counter to the evidence allegedly before it. "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Mo. Pub. Serv. Comm'n v. FERC*,

337 F.3d 1066, 1075 (D.C. Cir. 2003). The agency has not explained how its retention of authority to enforce the standards through an enforcement proceeding on its own indicates that the agency acted rationally when relying on the self-certification form.

Neither does the agency's assertion that withholding renewals for any citation would be unrealistic provide an adequate justification in the "smoking gun" case. According to Appellants' allegations, Cricket Hollow Zoo did not merely have a few citations. They allege that USDA had a consistent record of the Zoo's chronic noncompliance, and that the agency had no reason to suspect that anything had changed at the time of the renewal. In fact, Appellants claim that an inspection that took place on the same day that the 2015 renewal issued resulted in the agency finding a number of serious violations. *See* Appellants' Br. 22 (citing APHIS Inspection Report 147151639230365 (May 27, 2015), *reprinted in* App. 387-92).

Finally, the fact that the agency has now taken enforcement action against the Sellners does not moot Appellants' arbitrary and capricious claim. The Cricket Hollow Zoo continues to operate as a USDA-licensed animal exhibition. A decision that the agency's renewal scheme or its grant of the Sellners' 2015 license renewal application is invalid under the APA would alter that state of affairs in a manner likely to remedy, at least in part, Appellants' injuries. So long as that is the case, the controversy before the court remains live. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (internal quotation marks omitted)).

We hold that, on this record, the District Court erred in granting the Government's motion to dismiss Appellants'

arbitrary and capricious claim. We therefore vacate that judgment and remand the case to the District Court with instructions to remand the record to the agency. "Where we 'cannot evaluate the challenged agency action on the basis of the record before [us], the proper course . . . is to remand to the agency for additional investigation or explanation.'" *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). On remand, the agency must, at a minimum, explain how its reliance on the self-certification scheme in this allegedly "smoking gun" case did not constitute arbitrary and capricious action. The agency may revisit its decision to renew the disputed license. And, of course, the agency may opt to take appropriate action to amend its regulatory scheme.

Should the agency choose to reissue its license renewal decision or to maintain its position that it may rely on a license renewal applicant's self-certification to demonstrate compliance, even when it has concrete evidence that the applicant is routinely and currently out of compliance with AWA standards, the District Court may not uphold that action unless it finds that USDA acted rationally and engaged in reasoned decisionmaking. As part of this inquiry, the District Court should reconsider its decision denying Appellants' motion to supplement the administrative record. In order to analyze the agency's rationale for relying on the self-certification scheme in an allegedly "smoking gun" case such as this, the court must have access to other records the agency had in its possession at the time of its decision. The court may compel the agency to include such "background information" if it finds it necessary to review those documents "in order to determine whether the agency considered all of the relevant factors" when making its decision. *Am. Wildlands*, 530 F.3d at 1002 (internal quotation marks omitted).

### III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the District Court on the statutory claim. We vacate the District Court's order granting the Government's motion to dismiss Appellants' arbitrary and capricious claim, and remand the case to the District Court with instructions to remand the record to the agency for further proceedings consistent with this opinion.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring in part and concurring in the judgment: I concur in the opinion of the majority except as to the reasoning in Section II.B. The analysis of the district court and the arguments of the parties focused almost entirely on whether a license renewal by the agency is "issued" under 7 U.S.C. § 2133. Although I agree with the majority that the agency's scheme for renewing licenses is permissible under the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.*, I am more comfortable resting that determination upon the question that has driven this litigation.

The Act is silent, or at least ambiguous, as to what process (if any) is required for license renewals. As other courts have recognized, the plain meaning of "issue" does not necessarily include renewals. *See People for the Ethical Treatment of Animals v. USDA*, 861 F.3d 502, 509 (4th Cir. 2017); *Animal Legal Def. Fund v. USDA*, 789 F.3d 1206, 1216 (11th Cir. 2015). Nothing in the statute instructs the agency to require a renewal process at all. Even so, USDA has established a regulatory scheme for license renewals, but that scheme requires only the filing of an application, the payment of a fee, and self-certification of compliance with agency standards. *See* 9 C.F.R. §§ 2.1(d), 2.2(b), 2.5-2.7. We typically defer to an agency's interpretation of the statute it administers so long as the statute is "silent or ambiguous with respect to the specific issue" and the interpretation is "reasonable." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

USDA argues that "issue" is ambiguous and the agency has interpreted the term to exclude renewals. As it explains, a license is "issued" only when first granted. After that, the same license is continued through an annual administrative process. The agency actually added language to its licensing regulations "necessary to avoid any misconception that every license automatically terminates at the end of its 1-year term." Animal

Welfare Regulations, 54 Fed. Reg. 10,835, 10,841 (Mar. 15, 1989).

In my view, it is perfectly reasonable for the agency to establish an administrative renewal scheme and allocate its limited resources elsewhere. *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."). This allows the agency to focus on initial license applications and unannounced inspections. Animal Welfare; Inspection, Licensing, and Procurement of Animals, 69 Fed. Reg. 42,089, 42,094 (July 14, 2004); *see also Animal Legal Def. Fund*, 789 F.3d at 1224 (finding that the renewal scheme reasonably balanced Congress's "conflicting policy interests" of licensee due process rights and animal health and welfare). We should defer to the agency's judgment. *See Chevron*, 467 U.S. at 844 ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").

The majority sidesteps the meaning of "issue" because, in its view, the explanation the agency has advanced in this case is nothing more than a post-hoc litigation strategy. According to the majority, the agency has never actually interpreted the term and therefore is not entitled to deference. "The regulations say nothing about the meaning of the term 'issue' under 7 U.S.C. § 2133 and do not suggest that USDA has ever interpreted that section not to encompass license renewal." Maj. Op. at 21.

I read the agency regulations differently. When the Act first became law, the renewal process the agency created required only the paying of a fee and the filing of revenue

receipts. Laboratory Animal Welfare, 32 Fed. Reg. 3270, 3271 (Feb. 24, 1967). No demonstration of compliance was required. That was called for in an entirely separate section of the regulations related to the "[i]ssuance of licenses." *Id.* The regulation of renewals came four sections later. *See id.*

The majority notes a later revision to the regulations requiring that "each applicant for a license *or renewal of a license must demonstrate compliance* with the regulations and standards." Maj. Op. at 18-19 (emphasis in majority opinion) (quoting 54 Fed. Reg. at 10,840). But this revision also removed "before a license will be issued" from the same provision on the ground that it was incongruent with renewals. 54 Fed. Reg. at 10,840; *see* Animal Welfare, 54 Fed. Reg. 36,123, 36,149 (Aug. 31, 1989). The clear implication is that the agency never understood "issue" to include renewals.

I would join our sister circuits and defer to USDA's considered judgment that a renewal is not "issued" under § 2133, and that its renewal scheme is therefore a permissible interpretation of the Act. *See People for the Ethical Treatment of Animals*, 861 F.3d at 508-12; *Animal Legal Def. Fund*, 789 F.3d at 1215-25. Because the majority is clear that its analysis does not "reach the 'issue' issue," Maj. Op. at 26, there is nothing in the opinion that prevents the agency from interpreting "issue" as it has in its arguments to us.