# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 20-1067**

**September Term, 2020**

FILED ON: MAY 28, 2021

RAED MCCRACKEN JARRAR,
        PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
        RESPONDENT

---

On Petition for Review of an Order
of the National Labor Relations Board

---

Before: HENDERSON, ROGERS and WILKINS, *Circuit Judges*.

## J U D G M E N T

This case was considered on the record from the National Labor Relations Board, and on the briefs and oral argument of the parties. The Court has accorded the issues full consideration and determined they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). For the following reasons, it is

**ORDERED** and **ADJUDGED** that the petition for review be **DENIED**.

## I.

Petitioner Raed Jarrar seeks review of a Board order that dismissed an unfair labor practices complaint against Amnesty International of the USA, Inc. ("AIUSA"). Jarrar, a former employee of AIUSA, was the charging party before the Board. In February 2018, a group of AIUSA interns approached Jarrar with a draft petition requesting that interns be paid for their work; Jarrar provided feedback on the draft and collected signatures from AIUSA employees in support of the petition. The unfair labor practices complaint alleged that AIUSA, acting through Executive Director Margaret Huang, violated Section 8(a)(1) of the National Labor Relations Act in responding to the petition. After a one-day trial, an ALJ found that AIUSA had committed the alleged violations, but the Board disagreed and ordered that the complaint be dismissed.

1

The court "will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *Bob's Tire Co. v. NLRB*, 980 F.3d 147, 153 (D.C. Cir. 2020) (internal quotation marks omitted) (quoting *Int'l Longshore & Warehouse Union v. NLRB*, 890 F.3d 1100, 1107 (D.C. Cir. 2018)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Ingredion Inc.*, 930 F.3d 509, 514 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). The court will not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488; *accord Bob's Tire Co.*, 980 F.3d at 153.

## II.

Jarrar first contends that the Board departed from its precedent and procedural rules by issuing a decision while settlement discussions were ongoing between the Board's general counsel and AIUSA. The court lacks jurisdiction to review this objection because it was not urged before the Board. *See* 29 U.S.C. § 160(e). Although the nature of the claimed error meant that Jarrar could not have raised it prior to the Board's decision, he was required to file a petition for Board reconsideration. *See AdvancePierre Foods, Inc. v. NLRB*, 966 F.3d 813, 820 (D.C. Cir. 2020). He did not do so. Even when a claim could not have been anticipated prior to the Board's decision, "failure to seek Board reconsideration bars [court] review under [§ 160(e)]." *Lee Lumber & Bldg. Material Corp. v. NLRB*, 310 F.3d 209, 216 (D.C. Cir. 2002).

Jarrar contends in his reply brief that his pro se status and the coronavirus pandemic constitute "extraordinary circumstances" sufficient to excuse the § 160(e) review bar. Jarrar neither cites authority that representing oneself can excuse the § 160(e) bar, nor makes a showing that the pandemic prevented him from seeking reconsideration, inasmuch as it did not impede him from filing his pro se papers in this court.

Jarrar next contends that the Board's decision is unsupported by substantial evidence, insofar as it found that AIUSA did not violate Section 8(a)(1) of the Act. Section 8(a)(1) provides that an employer may not "interfere with, restrain, or coerce employees in the exercise of," 29 U.S.C. § 158(a)(1), their Section 7 rights to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157. "An employer's statement that, 'considering the totality of the circumstances, has a reasonable tendency to coerce or to interfere with those rights,' violates [S]ection 8(a)(1)." *Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 543 (D.C. Cir. 2016) (alteration omitted) (quoting *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001)). The inquiry is an objective one; "whether an employer's conduct trenches upon Section 7 rights turns on how a reasonable employee would have understood the action." *Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 45 (D.C. Cir. 2018). The Act permits an employer to express "views, argument, or opinion" without engaging in an unfair labor practice, so long as "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

2

The Board's principal conclusion, that Huang's statements did not contain any threat of reprisal, is supported by substantial evidence. Huang made the statements at issue in meetings on April 9 and May 9, 2018. For more than a year prior, AIUSA's executive team had been discussing a transition to a paid internship program, which would involve a reduction from a few dozen unpaid interns to three paid interns. On April 2, 2018, Huang presented the results of an employee satisfaction survey. Huang and the rest of the organization's leadership were unaware of the interns' developing petition. During the April 2 meeting, Jarrar asked Huang whether AIUSA would consider paying interns. She responded positively, and described the plan for a paid internship program. The next day, April 3, the interns emailed Huang the petition, "express[ing] [their] concerns about management's policy of not offering financial compensation for [the interns'] work." Joint Ex. 1, at 3. The petition was signed by interns and employees from AIUSA's D.C. office, including some employees who had been present at the April 2 meeting. Huang and the executive team then decided to begin the transition to paid internships in the fall of 2018.

On April 9, Huang held two meetings to announce the new plan: one with the current interns and one with the employees who signed the petition. At the employees' meeting, many staff reacted negatively to the announcement, which surprised Huang. The employees expressed concern about the effect that the sharp reduction in the number of interns would have on their ability to perform their work. In response, Huang expressed disappointment that employees did not avail themselves of her open-door policy to discuss the matter before circulating the petition.

On May 9, 2018, Jarrar met with Huang. He recorded the meeting on his cell phone without Huang's knowledge. Jarrar began by saying that after the April 9 meeting "many staff members felt like there was tension" and a "few people . . . thought that they're going to lose their jobs." May 9 Tr. at 6. Huang replied that AIUSA had never "fired anybody for signing a petition." *Id.* Jarrar responded that "the vibe of the meeting" suggested that Huang felt "personally betrayed." *Id.* Huang replied,

> I was very embarrassed actually that nobody had talked to me. It really made me feel like I was the man, which I didn't expect to feel. I thought we had a kind of relationship where people could come and express their views and ask for consideration of a change in policy without organizing something.

*Id.* Jarrar acknowledged that after the April 9 meeting he "personally did not feel like [his] job was on the line." *Id.* at 7. Later in the conversation, Huang suggested that Jarrar "could try talking to us before you do another petition." *Id.* at 33. Jarrar responded that Huang's request at the April 9 meeting to be warned of a petition before receiving it "was perceived by many staff, including myself, as a request to tell on colleagues." *Id.* Huang explained,

> I'm not disputing that petitions can be an effective tactic . . . . A petition is used to demonstrate popular support for a demand. If the demand can be met without applying that pressure, there's no reason to do the petition. So if somebody came to you and said we should do a petition because we should have, I don't know, something that, you know,

3

that the organization would be willing to consider, it doesn't make sense to do the petition, strategically. It actually sets off a more adversarial relationship. Look, so I'm not telling you, you should never tell somebody you shouldn't do the petition.

*Id.* at 33–34. Huang explicitly stated, "I'm not asking anybody to tell on somebody." *Id.* at 45.

Consequently, there was substantial evidence for the Board's conclusion that AIUSA did not threaten employees with reprisals as a result of the petition. Huang received the petition the day after she had told a group of employees that AIUSA was strongly considering paid internships. When Huang announced that AIUSA would implement the petition's central demand, many of the employee signatories reacted negatively. In this context, the Board permissibly concluded that Huang's April 9 statements did not convey any threat of reprisal, but merely her sense that a pre-petition dialogue would have produced more careful consideration of the issues. In the May 9 conversation, Huang stated that signatories' jobs were not at risk. Huang similarly rebuffed Jarrar's suggestion that she viewed the petition as a personal betrayal. In all, there was substantial evidence for the Board's conclusion that Huang's statements did not contain a threat of reprisal.

Jarrar relies on distinguishable Board cases to argue that Huang's statements of "personal disappointment" constituted an "implied threat," Pet'r's Br. 29, that employee signatories were "branded as disloyal," *id.* at 30, and that Huang attempted to "dictate her own procedural process for collective action," *id.* at 32. But the conduct in these cases differed substantially in degree from AIUSA's conduct here. In *Print Fulfillment Services LLC*, 361 N.L.R.B. 1243 (2014), a supervisor approached an employee with a union campaign flyer in which the employee appeared, pointed at the employee's picture, said he was "disappointed" and, after the employee's response, turned red-faced and walked away. *Id.* at 1243. The Board observed that the supervisor's unwillingness to continue the conversation "confirm[ed] his strong feelings about the matter" and that in all the circumstances, his actions "reasonably tended to convey that he was not merely disappointed . . . but felt strongly enough to take action against [the employee]." *Id.* at 1243–44. In *Sogard Tool Co.*, 285 N.L.R.B. 1044 (1987), the Board found that the employer laid off union supporters and characterized the layoffs as "ridding the plant of a cancer." *Id.* at 1044, 1047–49. In *Westwood Health Care Center*, 330 N.L.R.B. 935 (2000), the relevant conversations occurred "against 'a background of hostility' and unlawful conduct," including an express statement by the employer that employees were forbidden to engage in union activities. *Id.* at 941. In *Tito Contractors, Inc.*, 366 N.L.R.B. No. 47 (2018), the company's owner characterized protected activity as "stabbing me in my back," adding "I don't want stabbers in the company." *Id.* slip op. at 1. The Board did not act arbitrarily in deciding the instant case differently than those cited by Jarrar.

Jarrar's authorities concerning required procedures for raising complaints similarly do not show the Board committed an error. Board precedent confirms that "an employer may not interfere with an employee's right to engage in Section 7 activity by requiring that the employee take all work-related concerns through a specific internal process." *Valley Hosp. Med. Ctr., Inc.*, 351 N.L.R.B. 1250, 1254 (2007). In *Valley Hospital*, the employer raised an employee's failure to follow an internal process as a justification for its termination of the employee. *Id.* at 1251, 1254.

4

In *Kinder-Care Learning Ctrs.*, 299 N.L.R.B. 1171 (1990), the employer's policy required employees to first report complaints to the employer and indicated that failure to do so could result in discipline. *Id.* at 1172. Here, no retaliatory termination or other disciplinary response is alleged. As the Board acknowledges, however, "whether a rule is unlawful 'is not premised on mandatory phrasing, subjective impact, or even evidence of enforcement, but rather on the reasonable tendency of such a prohibition to coerce employees in the exercise of fundamental rights protected by the Act.'" *The Boeing Co.*, 362 N.L.R.B. 1789, 1791 (2015) (quoting *Radisson Plaza Minneapolis*, 307 N.L.R.B. 94, 94 (1992)). In context, even employer statements that merely "recommend" or "request" can unlawfully restrain employees' Section 7 activity. *Id.* For example, in *Boeing Company* the Board held that the employer violated Section 8(a)(1) by maintaining a policy "recommending" that employees refrain from discussing human resources investigations with union representatives, where the policy was reinforced by a requirement that employees sign a document indicating they had received and understood it. *Id.* at 1791–92. Again, the Board did not act arbitrarily in finding the instant case distinguishable.

Finally, insofar as Jarrar relies on an email from an AIUSA Union Shop Steward describing the April 9, 2018 meeting, the email is not part of the record, and this court's review is limited to the record evidence. *See* 29 U.S.C. § 160(e). Jarrar suggests that the court can expand the record under Federal Rule of Appellate Procedure 10(e), but that rule applies to appeals from a judgment or order of a district court, not upon a petition for judicial review of agency action. The contents of the record in the instant case are governed by Federal Rule of Appellate Procedure 16, which allows parties to "supplement the record only when they are able to 'demonstrate unusual circumstances justifying a departure from [the] general rule'" that the record is limited to materials presented before the agency. *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). Jarrar has made no showing of such unusual circumstances.

Because the conclusion that Huang's statements were non-coercive provided sufficient grounds for the Board's dismissal of the Section 8(a)(1) complaint, the court has no occasion to consider the Board's reasoning on the alternate ground that the interns and employees had not engaged in protected Section 7 activity.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:   /s/
Daniel J. Reidy
Deputy Clerk