# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 13, 2015          Decided June 28, 2016

No. 14-1249

SIERRA CLUB,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN PETROLEUM INSTITUTE, ET AL.,
INTERVENORS

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Nathan Matthews* argued the cause for petitioner. With him on the brief was *Sanjay Narayan*.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Karin L. Larson*, Attorney.

*Jonathan S. Franklin* argued the cause for respondent-intervenors Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P. With him on the brief were *Lisa M. Tonery* and *Charles R. Scott*.

*Catherine E. Stetson* was on the brief for intervenor American Petroleum Institute in support of respondent. *Stacy R. Linden* and *Benjamin Norris IV* entered appearances.

Before: ROGERS, GRIFFITH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Sierra Club seeks review of the authorization by the Federal Energy Regulatory Commission of an increase in production capacity at a liquefied natural gas terminal in Louisiana. According to Sierra Club, the Commission failed to consider certain environmental consequences of its authorization, in violation of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq*. The Commission initially challenges Sierra Club's standing under Article III of the Constitution to bring this petition. For reasons we explain, we conclude that Sierra Club has standing but that its challenges to the Commission's orders fail on the merits, largely for the reasons stated in the companion case, *Sierra Club v. FERC (Freeport)*, No. 14-1275 (D.C. Cir June 28, 2016), and otherwise the court lacks jurisdiction over challenges to the Commission's cumulative impacts analysis due to Sierra Club's failure to exhaust its administrative remedies. Accordingly, we dismiss the petition in part and deny the petition in part.

**I.**

Until 1977, section 3 of the Natural Gas Act of 1938, Pub. L. No. 75-688, 52 Stat. 821, 822 (codified as amended at 15 U.S.C. § 717b), required the now-defunct Federal Power Commission ("FPC") to approve any application to export natural gas to a foreign country unless the proposed export "will not be consistent with the public interest." 15 U.S.C. § 717b(a);

*see also id.* § 717a(9). In 1977, Congress abolished the FPC, created the Federal Energy Regulatory Commission, and transferred the section 3 authority to the Secretary of the Department of Energy ("the Secretary"). Department of Energy Organization Act, §§ 301(b), 401(a), 402(a), Pub. L. No. 95-91, 91 Stat. 565, 578, 582–84 (codified at 42 U.S.C. §§ 7151(b), 7171(a), 7172(a)). Subsequently, Congress amended section 3 to vest in the Secretary "the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of [a liquefied natural gas] terminal." Energy Policy Act of 2005, Pub. L. No. 109-58, § 311(c)(2), 119 Stat. 594, 686 (codified at 15 U.S.C. § 717b(e)(1)). The Secretary has delegated to the Commission the decision under section 3 whether to "[a]pprove or disapprove the construction and operation of particular facilities" used for the import or export of natural gas, the location of such facilities, and when new construction is involved, the entry point for imports and exit point for exports of natural gas. *See* Dep't of Energy, Delegation Order No. 00-004.00A, § 1.21(A) (May 16, 2006); 42 U.S.C. § 7172(f). The Commission, however, lacks the power to authorize the actual import and export of natural gas; the Secretary has delegated that section 3 function to the Assistant Secretary of Energy for Fossil Energy. *See* Dep't of Energy, Redelegation Order No. 00-006.02, § 1.3(A) (Nov. 17, 2014).

The Commission, in exercising its section 3 authority, must comply with NEPA and its implementing regulations, which require that all federal agencies include an environmental impact statement ("EIS") "in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.11. To determine whether an EIS is necessary, an agency first prepares an environmental assessment, 40 C.F.R. § 1508.9, which must include, among other information, a

discussion of "the environmental impacts of the proposed action," *id.* § 1508.9(b). "Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7; *see also id.* § 1508.8. After preparing an environmental assessment, an agency may conclude that the proposed action would have no significant impact (often referred to as a "FONSI," for "finding of no significant impact") in lieu of issuing an EIS. *Id.* §§ 1508.9(a)(1), 1508.13.

The petition before the court challenges whether the Commission complied with NEPA when, pursuant to its delegated section 3 powers, it approved an increase in production capacity at a liquefied natural gas terminal ("the Terminal") in Cameron Parish, Louisiana, operated by Sabine Pass Liquefaction, LLC, and Sabine Pass LNG, L.P. (collectively "Sabine Pass"). The Commission initially approved the construction and operation of the Terminal as a facility for the *import* of liquefied natural gas into the United States. *Sabine Pass LNG, L.P. & Cheniere Sabine Pass Pipeline Co.*, 109 F.E.R.C. ¶ 61,324 (2004); *Sabine Pass LNG, L.P.*, 115 F.E.R.C. ¶ 61,330 (2006). Changes in market conditions, however, prompted Sabine Pass to seek Commission authorization to construct and operate facilities that would permit the Terminal to receive natural gas produced in the United States, liquefy it, and prepare it for *export* to points abroad. In 2012, the Commission authorized Sabine Pass to liquefy and prepare for export up to 16 million tons of natural gas per year. *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.* (the "2012 Order"), 139 F.E.R.C. ¶ 61,039 at PP 1, 4.

(2012). Sierra Club, which participated in the Commission proceedings, did not petition for judicial review of the 2012 Order.

The Commission orders that Sierra Club now challenges amend the 2012 Order and deny rehearing of the decision to amend. On October 25, 2013, Sabine Pass requested that the Commission authorize it to use the Terminal to liquefy and prepare for export an additional 4 million tons of natural gas per year — in total up to 20 million tons per year. NEPA required the Commission to conduct an environmental analysis of Sabine Pass's proposed amendment, and Sierra Club, which intervened in the application process, argued that the Commission needed to consider several specific environmental consequences in its analysis. Among them were two environmental consequences that form the core of Sierra Club's petition to the court. First, Sierra Club argued that increasing the volume of exported natural gas would induce U.S. natural gas producers to extract and process more gas in order to meet the increase in demand and thereby cause more gas production-related environmental harm. Second, Sierra Club argued there would be increased air pollution resulting from increased coal burning, because (1) increasing the volume of natural gas exports would more fully integrate the domestic natural gas market with the global market, where the price of natural gas is generally higher; (2) market integration would cause domestic natural gas prices to rise as the lower domestic price and the higher global price reach an equilibrium; (3) this hike in domestic gas prices would prompt U.S. energy consumers — in particular electric utilities — to switch from using natural gas to using coal, which is cheaper than natural gas but generates more air pollution. In Sierra Club's view, both of these environmental consequences of Sabine Pass's proposal constituted "indirect effects" of the proposed amendment and therefore had to be considered in the Commission's NEPA analysis. Sierra Club also maintained that

the Commission must consider these indirect effects as "cumulative impacts" alongside all other pending natural gas export proposals.

Pursuant to NEPA, the Commission produced an environmental assessment of Sabine Pass's latest proposal. It summarily rejected Sierra Club's comments, stating that it had addressed them in the environmental assessment that it conducted in connection with the 2012 Order. The Commission proceeded to grant Sabine Pass's request and amended the 2012 Order to increase the maximum volume of natural gas that it could liquefy at the Terminal from 16 to 20 million tons per year. *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.* ("2014 Amend."), 146 F.E.R.C. ¶ 61,117 at PP 5, 12 (2014) ("the 2014 Amendment"). In so doing, the Commission explained in greater detail its rejection of Sierra Club's comments. *Id.* at PP 15, 19. The Commission observed that with respect to effects flowing from export-driven increases in domestic natural gas prices, the Department of Energy — and not the Commission — possessed the legal authority to approve any increase in the volume of natural gas actually exported. *Id.* at P 10. The Commission also determined that induced natural gas production was not a reasonably foreseeable consequence of the 2014 Amendment and therefore not an indirect effect under NEPA. *Id.* at P 15. Furthermore, in the Commission's view, the 2014 Amendment did not generate any new impacts that NEPA required it to consider cumulatively. *Id.* at P 19. Instead of generating an EIS, the Commission therefore issued a FONSI. *Id.* at P 20. The Commission denied Sierra Club's request for rehearing, reiterating the determinations it had made in granting the 2014 Amendment. *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.* ("Rehr'g Order"), 148 F.E.R.C. ¶ 61,200 at PP 10–14 (2014).

## II.

Sierra Club challenges the Commission's orders granting the 2014 Amendment and denying rehearing on the ground that the Commission's NEPA analysis was deficient. That analysis, Sierra Club contends, failed to consider two indirect effects and should also have considered those effects cumulatively alongside all pending and approved proposals to increase the volume of natural gas prepared for export nationwide. To determine whether the court has jurisdiction to consider these challenges, the court must first determine whether Sierra Club has standing under Article III of the Constitution.

An organization has associational standing to bring suit on its members' behalf when: (1) at least one of its members would have standing to sue in his or her own right; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 7 (D.C. Cir. 2015). That Sierra Club meets the latter two requirements is unchallenged and clear, while the first requirement warrants discussion.

To satisfy the first requirement of the associational standing inquiry, Sierra Club must show that: (1) at least one of its members has suffered an "injury-in-fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560–61 (1992)). It must demonstrate a "substantial probability" that it satisfies each element of standing. *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002). Where, as here, a party alleges deprivation of its procedural rights, courts relax the normal standards of redressability and imminence. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) (citing *Lujan*, 504 U.S. at 572 n.7). As for causation, in a NEPA procedural injury case, the petitioner need demonstrate only that "the procedural step was connected to the substantive result," not that "the agency would have reached a different substantive result" but for the alleged procedural error. *WildEarth Guardians*, 738 F.3d at 306 (internal citations omitted); *see also City of Dania Beach v. FAA*, 485 F.3d 1181, 1186–87 (D.C. Cir. 2007); *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002). "[A]n adequate causal chain must contain at least two links: one connecting the omitted [NEPA analysis] to some substantive government decision that may have been wrongly decided because of the lack of [proper NEPA analysis] and one connecting that substantive decision to the plaintiff's particularized injury." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc). It must be substantially probable "that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff . . . ." *Id.* at 669.

Sierra Club meets the requirements of associational standing on the basis of a declaration submitted by one of its members, John Paul. Paul "fish[es], boat[s], and seasonal duck hunt[s] frequently around Keith Lake, the south side of Sabine Lake," "the Texas Point National Wildlife Refuge," and "the Sabine River (on the south side of the Sabine Lake)." Decl. of John Paul ("Paul Decl.") ¶¶ 5, 9 (May 19, 2015). The Terminal sits along the shoreline of the Sabine Pass Channel, a waterway

through which Sabine Lake empties into the Gulf of Mexico. Paul attests "the increase in [liquefied natural gas] vessel traffic from the Sabine Pass [Terminal]" will: (1) harm his aesthetic interests in the waterways around the Terminal; (2) inconvenience him, given the "large exclusion zone the Coast Guard maintains around [tankers]"; and (3) "diminish [his] use and enjoyment of the waterways, and specifically the Sabine River and Texas Wildlife Refuge." *Id.* In fact, due in part to existing levels of operation at the Terminal, Paul recently moved his "primary boat" from Sabine Pass to Galveston, Texas. *Id.* ¶ 7. Sierra Club contends that Paul satisfies the elements of standing because: (1) increased tanker (*i.e.*, cargo vessel) traffic will harm Paul's aesthetic and recreational interests; (2) the 2014 Amendment will result in increased production of liquefied natural gas for export, the transport of which will require additional tankers; and (3) a decision in favor of Sierra Club would give the Commission the chance to reconsider the increase in production capacity it approved in the 2014 Amendment after it corrects its NEPA analysis.

There can be little doubt that Paul will suffer cognizable aesthetic and recreational harm were the volume of tanker traffic to and from the Terminal to grow. *See Friends of the Earth*, 528 U.S. at 182–83; *Lujan*, 504 U.S. at 562–63; *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972); *Minisink Residents for Envtl. Preservation & Safety v. FERC*, 762 F.3d 97, 106 (D.C. Cir. 2014). The Commission's suggestion that Paul "appears to no longer fish near the Sabine Pass terminal" after moving his boat to Galveston, Resp't's Br. 25, misreads the Paul Declaration. Paul states, in the present tense, that he "frequently" fishes, boats, and hunts in waterways near the Terminal. Paul Decl. ¶ 5. He also expresses concern that greater tanker traffic "will" diminish his use and enjoyment of those waterways. *Id.* ¶ 9. That Paul moved his "primary boat" to Galveston does not undermine his claim that he presently

boats near the Terminal and will continue to do so in the future. If anything, Paul's decision to move one of his boats partly in response to the Terminal's current production levels (up to 16 million tons per year) gives credence to his assertion that additional tanker traffic will compound his aesthetic and recreational injury.

Sierra Club has also demonstrated a substantial probability that an increase in production capacity at the Terminal will cause an increase in tanker traffic. The Commission insists that the 2014 Amendment will not result in a greater number of tankers traversing the waters around the Terminal. *See* Resp't's Br. 26. Throughout the process of approving an additional 4 million tons of annual production capacity at the Terminal, the Commission maintained that the 2014 Amendment would not increase the maximum number of tankers — 400 per year — authorized to serve the Terminal in the 2012 Order. Sabine Pass Amend. Envtl. Assessment ("2014 Envtl. Assessment") at 5 (2014); 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 18; Rehr'g Order, 148 F.E.R.C. ¶ 61,200 at PP 8–9. Yet keeping constant the *authorized maximum* number of tankers is not the same thing as keeping constant the *actual* number of tankers plying the waterways near the Terminal.

To the contrary, the record demonstrates that even when the authorized maximum number of tankers remains steady, an increase in the volume of natural gas prepared for export corresponds with an increase in the number of tankers needed to ferry it into foreign commerce. In fact, there is a roughly linear relationship between production capacity and the number of tankers needed. A production capacity of 8 million tons of liquefied natural gas per year requires an estimated 69 to 147 tankers, whereas a production capacity of 16 million tons per year requires twice that — between an estimated 138 and 294 tankers. *See* Sabine Pass Liquefaction Project Envtl.

Assessment at 2-15 (2011). Sabine Pass has entered into contracts to export 18 million tons of liquefied natural gas per year. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 12 n.18. That is 2 million tons above the maximum production capacity of 16 million tons per year authorized by the 2012 Order. *Id.* at P 5. There is a very substantial probability that Sabine Pass will require more tankers to transport the additional 2 million tons of natural gas per year, a quantity it could not legally liquefy and prepare for export but for the 2014 Amendment.

Therefore, Sierra Club satisfies the causation and redressability requirements of Article III standing. First, the alleged omissions in the Commission's NEPA analysis are connected to the Commission's decision to authorize the increased volume of production in the 2014 Amendment. If Sierra Club prevails on the merits, the Commission will have to incorporate into its NEPA analysis the omitted indirect effects and cumulative impacts. Upon considering those effects, the Commission could change its position and deny Sabine Pass's application for additional production capacity. Second, the decision to authorize additional production capacity in the 2014 Amendment is connected to the harm to Paul's aesthetic and recreational interests. Absent the 2014 Amendment, Sabine Pass could not fulfill its contractual obligations to export 2 million tons of liquefied natural gas per year above the pre-2014 Amendment production ceiling. It is substantially probable — if not more likely still — that those 2 million tons of additional export will require additional tankers, and those additional tankers are the source of the harm to Paul's aesthetic and recreational interests.

The Paul Declaration is distinguishable from the declarations submitted in *National Committee for the New River, Inc. v. FERC*, 433 F.3d 830 (D.C. Cir. 2005). Petitioners in that case challenged the realignment of a natural gas pipeline,

yet their affidavits focused not on harms arising from the realignment but on general harms arising from the construction of the pipeline in the first place. *Id.* at 831–32. Nothing in the affidavits explained how their injuries depended on whether the pipeline crossed one part of the New River versus another. *Id.* at 832. Here, by contrast, the Paul Declaration attributes his injury to the "increase in operations" at the Terminal and "additional operation of the export facility." Paul Decl. ¶¶ 7–10. Even if Paul would suffer a similar type of harm in the absence of the 2014 Amendment, the 2014 Amendment will cause him to suffer an additional quantum of that harm.

The Commission's reliance on *Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009), mistakes sufficiency for necessity. There, members of the petitioner organization detailed in their affidavits "definitive dates in the near future" when they planned to observe animals affected by offshore oil and gas drilling. *Id.* at 479. But the court did not hold that a statement of definite dates is necessary to establish Article III standing where, as here, a member of a petitioner organization lives an hour's drive from the affected area and attests in a sworn statement that he "frequently" fishes, boats, and duck hunts in the waters around the Terminal. Paul Decl. ¶¶ 2, 5.

**III.**

Turning to the merits of Sierra Club's petition for review, the court's review of the Commission's compliance with NEPA is limited to determining whether the Commission's NEPA analysis was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (citing 5 U.S.C. § 706(2)(A)). NEPA requires a federal agency to take a "hard look" at the environmental consequences of a

major action prior to undertaking it. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). As a procedural statute, NEPA does not mandate any particular outcome. *Minisink Residents*, 762 F.3d at 111–12.

**A.**

Sierra Club contends that the Commission's NEPA analysis failed to consider two indirect effects of the 2014 Amendment. Both presuppose that the 2014 Amendment will increase natural gas export capacity and thereby expose the domestic natural gas market to new international demand. First, natural gas producers in the United States will extract and process more gas to meet this newly heightened demand for their product, thereby intensifying production-related pollution. Second, increasing export capacity will raise the domestic price of natural gas, and that, in turn, will prompt greater reliance on coal, a cheaper but more pollution-intensive fuel.

We disagree for the reasons stated in *Sierra Club (Freeport)*, No. 14-1275, Slip Op. at 13–20. What Sierra Club challenges here is the potential environmental effects flowing from greater natural gas *exports* from the Terminal. The two indirect effects at the heart of Sierra Club's petition cannot occur unless a greater volume of liquefied natural gas is shipped from the Terminal and enters the international marketplace. But the Commission orders challenged here do not authorize Sabine Pass to increase exports from the Terminal. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 5 n.10; Rehr'g Order, 148 F.E.R.C. ¶ 61,200 at PP 3 n.6, 14. Those orders only authorize an increase in production capacity at the Terminal. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at PP 11–12; Rehr'g Order, 148 F.E.R.C. ¶ 61,200 at P 3. As the Commission explained, the Department of Energy alone has the legal authority to authorize Sabine Pass to increase commodity exports of liquefied natural gas. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 10; Rehr'g Order, 148

F.E.R.C. ¶ 61,200 at PP 12–13; *see also* 15 U.S.C. § 717b(a); 42 U.S.C. § 7151(b); *compare also* Dep't of Energy, Redelegation Order No. 00-006.02, § 1.3(A) (Nov. 17, 2014), *with* Dep't of Energy, Delegation Order No. 00-004.00A, § 1.21(A) (May 16, 2006).  The challenged Commission orders therefore are not the legally relevant cause of the indirect effects Sierra Club raises. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769–70 (2004).  Accordingly, the Commission did not need to consider those effects in its NEPA review.  *Id.* at 770.  Sierra Club, of course, remains free to raise these issues in a challenge to the Energy Department's NEPA review of its export decision. Nothing in our opinion should be read to foreclose that challenge or predetermine its outcome.

Furthermore, the Commission adequately explained why it was not reasonably foreseeable that greater production capacity at the Terminal — separate and apart from any export activity — would induce additional domestic natural gas production. *See* 40 C.F.R. § 1508.8(b).  It concluded that the Terminal's liquefaction operations did not necessitate an increase in domestic natural gas production.  2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 15 (citing 2012 Order, 139 F.E.R.C. ¶ 61,039 at PP 94–99); Rehr'g Order, 148 F.E.R.C. ¶ 61,200 at P 13; *see also* 2012 Order, 139 F.E.R.C. ¶ 61,039 at P 98.  Whatever effect increased natural gas exports might have on domestic production levels, the Commission's conclusion was reasonable with respect to the effect of increasing production capacity.

## B.

Next, Sierra Club contends the Commission failed to take into account certain cumulative impacts of the 2014 Amendment.  In particular, Sierra Club maintains the Commission should have considered the impacts of the 2014 Amendment alongside several other proposals to increase natural gas export capacity nationwide, some pending, some

already approved. Those proposals include two other projects at the Terminal (the "Sabine Pass projects"). During administrative proceedings, the Commission determined that the 2014 Amendment would not contribute to any cumulative impacts. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 19. On appeal, the Commission contends that Sierra Club's argument fails on two grounds: (1) The court lacks jurisdiction to hear Sierra Club's contention regarding the other projects — save for one of the Sabine Pass projects — because it failed to raise them in its petition for rehearing before the Commission, and (2) in any event, NEPA did not require the Commission to consider the effects of the 2014 Amendment cumulatively with the other projects.

**1.** The court lacks jurisdiction to consider Sierra Club's challenge as it pertains to any projects other than the Sabine Pass projects. Section 19(a) of the Natural Gas Act requires that a party seek rehearing by the agency before challenging an order issued pursuant to the Act. 15 U.S.C. § 717r(a). Section 19(b) bars a court from hearing an objection to such an order where the objecting party failed to raise the objection in its application for rehearing and there are no reasonable grounds to excuse the party's failure. *Id.* § 717r(b). The purpose of the exhaustion requirement in § 717r is to give the Commission the first opportunity to consider challenges to its orders and thereby narrow or dissipate the issues before they reach the courts. *Moreau v. FERC*, 982 F.2d 556, 564 (D.C. Cir. 1993). The Natural Gas Act's jurisdictional provisions are stringent. *See Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 741 (D.C. Cir. 2007).

Sierra Club endeavors to hang jurisdiction on a very thin reed. In its Motion to Intervene, Sierra Club commented that the Commission needed to "consider the cumulative impacts of all pending export proposals." Mot. to Intervene, Protest &

Cmt. at 19 (Nov. 14, 2013). Its Motion for Rehearing, however, contains no mention of any projects besides other Sabine Pass projects. The header of the relevant section reads: "FERC Violated NEPA by Failing to Consider Connected Actions or the Cumulative Effect of Other Proposed Sabine and Related Pipeline Projects." Mot. for Rehr'g at 6 (Mar. 24, 2014). In that section, Sierra Club notes that the 2014 Amendment "is one of only a number [sic] of pending proposals for expansion of the Sabine Pass project" and mentions that "Sabine Pass has also applied for authorization to construct two additional liquefaction trains and pipeline modifications. CP13-552 and CP13-553." *Id.* Sierra Club maintains that this merely "drew the Commission's attention to" the specified Sabine Pass project but "did not suggest that these were the only relevant actions, for purposes of a cumulative impacts analysis." Pet'r's Reply Br. 33–34. This reads too much into its Motion for Rehearing. Nothing in that motion put the Commission on notice that Sierra Club was challenging the Commission's cumulative impacts analysis as it pertained to projects other than the Sabine Pass projects. In granting the 2014 Amendment, the Commission understood Sierra Club to contend that the Commission needed to consider natural gas projects unrelated to the Terminal. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 19. In denying rehearing, the Commission addressed only one of the other Sabine Pass projects while noting that Sierra Club on rehearing did not challenge the Commission's cumulative impacts analysis as to projects unrelated to the Terminal. Rehr'g Order, 148 F.E.R.C. ¶ 61,200 at P 11 n.22. Because the Commission was not on notice of Sierra Club's broader objection, it did not have the opportunity to consider them in the first instance. By contrast, in *Louisiana Intrastate Gas Corp. v. FERC*, 962 F.2d 37 (D.C. Cir. 1992), on which Sierra Club relies, the petitioner expressly and clearly stated its objection, albeit in a single sentence, *id.* at 41–42, and the Commission addressed the merits of the

objection in denying rehearing, *id.* at 42. Neither indicia of notice is present here.

**2.** On the merits, we hold that the Commission's orders are not arbitrary or capricious for failing to address the cumulative impacts of the 2014 Amendment and the Sabine Pass projects for largely the same reason stated in *Sierra Club (Freeport)*, No. 14-1275, Slip Op. at 22–23. The Commission provided a reasonable explanation for why it was unnecessary to conduct a cumulative impact analysis: The 2014 Amendment did not generate environmental impacts of the sort that NEPA requires it to consider cumulatively. 2014 Amend., 146 F.E.R.C. ¶ 61,117 at P 19; *see also Minisink Residents*, 762 F.3d at 113.

Accordingly, we dismiss Sierra Club's petition for review in part and deny it in part.